467 P.2d 954

**William T. MEADOWS, Petitioner,**

v.

**The INDUSTRIAL COMMISSION of Arizona, Respondent,
Arizona Public Service Company, Respondent Employer,
Arizona Public Service Company, Respondent Carrier.**

**No. 1 CA-IC 277.**

Court of Appeals of Arizona,
Division 1,
Department A.

April 16, 1970.

Rehearing Denied May 12, 1970.

Review Denied June 2, 1970.

Gorey & Ely, by Jeffrey D. Bonn, Phoenix, for petitioner.

Donald L. Cross, Chief Counsel, Phoenix, for respondent, The Industrial Commission of Arizona.

John S. Schaper, Phoenix, for respondent, Arizona Public Service Co.

STEVENS, Judge.

The petitioner sought to reopen his industrial claim to secure an increase in the amount of the award relative to his loss of earning capacity. The Industrial Commission denied the petition to reopen. This matter is before this Court for review. This case is decided under the law as it existed prior to 1 January 1969.

In our opinion, the petitioner's discharge for cause from his post-injury employment and the effect thereof upon his request for an increase in compensation are the vital features of this case. Had he lost his post-injury employment without fault on his part and then been unable to secure employment as the result of his industrial injury, the right to reopen for an increase, without showing a change in his physical condition, would have been clear under the case of Adkins v. The Industrial Commission of Arizona, 95 Ariz. 239, 389 P.2d 118 (1964). The corollary question is, granting for the sake of argument that there should be some penalty involving a loss of the increase in compensation where the post-injury employment is lost due to the workman's fault, for what period of time should that penalty be imposed? We are not faced with a refusal to accept employment as in Bierman v. Magma Copper Company, 88 Ariz. 21, 352 P.2d 356 (1960), followed by the employee's change of heart and his willingness to attempt post-injury employment which resulted in our opinion in Bierman v. The Industrial Commission of Arizona, 2 Ariz.App. 548, 410 P.2d 666 (1966), review denied.

The facts in this case present a real challenge to both the injured workman and to his employer.

For some time prior to 17 August 1956, the petitioner was a journeyman lineman in the employ of Arizona Public Service. On that day he was seriously burned. As a direct result of this industrial injury, his right forearm was amputated and his right knee was seriously and permanently damaged. He returned to work for his pre-injury employer on 24 May 1957 as a "results clerk." On 6 June 1958, an award was entered fixing his general physical functional impairment at 45% and his average monthly wage at the time of his injury at $469.16. The petitioner's work as a results clerk brought him an average monthly wage of $395. On 14 October 1959, a further award was entered finding a 15.61% loss of earning capacity and awarding to the petitioner the sum of $40.79 a month as and for compensation for his unscheduled permanent partial disability. The petitioner's responsibilities as a results clerk entailed the keeping of numerous records at his employer's Saguaro

Power Plant. This was an indoor type of employment.

On 14 March 1962, the petitioner wrote to his employer, in part, as follows:

"May I bring to your eyes a composite picture of myself? * * *

"All of my life, I have worked outdoors. My last outdoor work was as a lineman. Then, the accident made it necessary to go to work in a position of results clerk at Saguaro Steam Plant. I have tried to console myself and tried not to let confinement make me discontented; but as you know only too well, that if a wild bird or animal is caged in, no amount of love or tempting food can make it forget its longing for the open spaces. As a lineman, I could see the results of my work. As a clerk, it shows nothing but repetition and futility of purpose.

　　*　　*　　*　　*　　*　　*

"Truthfully, I can say that I have not had a breakfast in three years. * * * It is the thought of facing these green walls with the grey stripe curtains that gives me the feeling of uneasiness. If I try to drink a cup of coffee in the morning, I get out to my car and bingo—I lose it.

"My hand, that was supposed to be removed, gives me a great deal of trouble. Me [sic] knee aches all the time. While falling from the pole, the hammer that hurt my back when I had the accident, still gives me trouble. To put it mildly, I am a mess.

"My druggist bill for Milltown's [sic], Aspirin, Pepto Bismol, Milk of Magnesia, etc. is too large. It keeps me jumping and running.

"I talked to you once, and you told me that my retirement could be effective in 1963. I hope so because if retirement does not get me, I know the undertaker will. Would you let me know as to the possibilities of a retirement and all that will benefit me?"

At a later hearing [18 January 1966] after the petitioner's discharge and in connection with his request to reopen, the plant superintendent testified:

"A. Bill had real good abilities. By that I mean that he could do his work very efficiently and very thorough when he so desired.

"Q. Was his physical incapacity a detriment at all in the work he was doing?

"A. No. I don't believe so * * *."

In response to a later question the witness stated:

"A. Bill was rather moody at times. Like I stated before he has the ability to do very excellent work. If he was in a bad mood, we might say, then he was rather slipshod. But all in all he was a good employee as far as ability is concerned."

Prior to the petitioner's discharge by his employer, his record for absenteeism worsened. Other than his letter of 14 March 1962 and testimony of greatly increased nervousness on the part of the petitioner, the record does not affirmatively disclose the cause for the absenteeism. In any event on 7 May 1962, the petitioner's employer wrote a letter to him which was entitled "Unsatisfactory Absentee Record." We will summarize portions of the letter. The letter stated that it was a final warning and that if he would not or could not conform to company rules with reference to absenteeism and continued to be untruthful as to the reason for his absences, his employment would be terminated. The letter recited that for a short time after he reported to his new job as a results clerk he did the job very well and that it was considered that he had a considerable potential. After a year or two the petitioner seemed to slow down and lose interest. The company gave him pay increases hoping that that would stimulate an interest in his work. It was recognized that part of the absenteeism was probably due to actual personal illness, although much of the absenteeism appeared to be unjustified. The letter advised that the possibility of early retirement did not appear very promising. The letter further emphasized the necessity

of complete truthfulness on the part of the petitioner.

On 22 April 1965, the company terminated his employment making reference to the 7 May 1962 letter. The letter of termination concluded as follows:

"You will be given the usual two (2) weeks notice with pay, starting April 23, 1965, plus vacation pay earned in 1964."

Shortly after the termination of his employment, he presented himself at the Saguaro Plant and confronted key personnel in a threatening manner. This was hardly conducive to reemployment.

After the petitioner's employment had been terminated, he drew a small monthly unemployment compensation check for a brief period of time. He then filed a petition for readjustment or reopening and a hearing was held on 18 January 1966 before Referee Schreiber. The petitioner testified:

"Q. What was your reason for wanting early retirement, Mr. Meadows?

"A. Because I didn't like that job I was doing. If they couldn't find something else for me to do that I was more capable at—I just didn't care about it. It was repetitious; every day was the same thing over and over again.

"Q. What else did you feel that you were capable of doing or wanted to do?

"A. Well, there is lots of things I could have done. Check transformers; check lines. I could have done a lot of things.

"Q. Can you tell us some of the other things that you could have done other than checking transformers?

"A. Take voltage checks. Going to different towns and find out how the voltage is. Why it dropped down. Why it didn't stay up. If they need capacitors in it, why they need them.

"Q. Would those jobs you indicated involve electricity?

"A. It would."

The petitioner had been presented a prosthesis which he was no longer using. In relation thereto he testified:

"Q. How long has it been since you used your prosthesis?

"A. I imagine about six years.

"Q. Six years?

"A. Seven years.

"Q. Do you still have one?

"A. I have one, but I can't wear it. It's too tight. When I come out of the hospital I was only 90 pounds; and come up to 165. My arm got bigger and I can't put the darn thing on. It just tightens up on me."

The petitioner further testified as to his efforts to secure employment after he was discharged by Arizona Public Service.

Following the hearing, Referee Schreiber rendered his report [Industrial Commission Rule 41.3]. The report bears an "Approved" endorsement signed by C. E. Singer, Jr. as Chief Referee. The Commission issued its award on 23 May 1966 and reaffirmed its earlier 14 October 1959 award. The findings contained in this award are significant.

" FINDINGS

"1. That the applicant has not sustained an increased reduction in earning capacity and therefore is not entitled to an increase in compensation.

"2. That the aforementioned determination that the applicant has not sustained an increased reduction in earning capacity is based upon the following facts:

a. Applicant was employed as Results Clerk for the Arizona Public Service Company prior to the date on which he was discharged, April 22, 1965.

b. Applicant subsequent to the date of his termination, attempted to obtain employment, without success.

c. Applicant was very efficient, had good ability, and his physical incapacity was not at all a detriment in the work he was doing. Furthermore, this handicap had no bearing upon his ability to do the job.

d. Applicant was dismissed because of his absenteeism record, and for no other reason.

e. Applicant's physical condition has not deteriorated or worsened since the last award entered herein.

f. Applicant has the physical and mental capacity to perform the duties of the job he was performing at the time of his discharge.

"3. That the Amended Findings and Award for Unscheduled Permanent Partial Disability heretofore entered on October 14, 1959 should be affirmed.

## AWARD

"IT IS ORDERED that the Amended Findings and Award for Unscheduled Permanent Partial Disability heretofore entered on October 14, 1959, be, and the same is hereby affirmed. * * *."

After appropriate procedural steps Referee Schreiber conducted a further hearing on 15 December 1966. There was a further report by the Referee approved by Mr. Singer in his capacity as Chief Referee. Thereafter an award dated 31 January 1967 was entered which award affirmed the 23 May 1966 award. The January 1967 award became final.

In mid 1967, the petitioner employed his present counsel and again sought to reopen, seeking an increase in his compensation. An amendment to the petition to reopen recognized that he had "* * * [l]ost no earning capacity based strictly on experience with defendant employer but facts show value of applicant's services on open labor market have been substantially decreased and he is entitled to award based on his decrease." Thereafter a hearing was held on 30 August 1968 which was conducted by Referee von Blum. There was further testimony as to his job seeking efforts, similar to that presented at the January 1966 hearing. The prior testimony resulted in Finding No. 2(b) of the 23 May 1966 award. The August 1968 hearing disclosed further testimony as to the petition-

er's irritability and nervousness. There was no medical testimony to relate these problems to his industrial injury.

▪ In place of a report by Referee von Blum, the report of the hearing was made on 30 January 1969 by Mr. Singer in his capacity as a "Special Hearing Examiner." [Prior to January 1969, hearings were conducted by referees and since that date, hearings have been conducted by hearing officers.] No explanation was made as to why Mr. von Blum had not rendered the report. The petitioner lodged strenuous objections to the report being prepared by Mr. Singer rather than by Mr. von Blum. We have had before us the review of an Industrial Commission matter wherein the file was reviewed by a referee who did not hear the evidence. Kuchinski v. Industrial Commission of Arizona, 11 Ariz.App. 26, 461 P.2d 505 (1969). It is true that the circumstances in Kuchinski were different from the circumstances in the case now before us. It would have been better practice to have Mr. von Blum report on the hearing which he conducted or at least to have the file reflect the circumstances under which he did not make the report. In our opinion this does not constitute a sufficient ground for setting aside the award.

On 5 March 1969, The Industrial Commission entered its award affirming the 16 October 1967 award. This action was taken prior to the opinion in Russell v. The Industrial Commission of Arizona, 104 Ariz. 548, 456 P.2d 918 (1969). In Russell this procedure was not approved. Portions of the March 1969 award are as follows:

" FINDINGS

"1. That the applicant does not have new, additional or previously undiscovered disability.

"2. That the applicant has not sustained an increased reduction in earning capacity and therefore is not entitled to an increase in compensation.

"3. That the aforementioned determination that the applicant has not sustained

an increased reduction in earning capacity is based upon the following facts:

(a) Applicant's physical condition has, not deteriorated or worsened since the entry of the Decision Upon Rehearing of January 31, 1967.

(b) That applicant still has the physical and mental ability to perform the duties of the job classified as Results Clerk for the Arizona Public Service Company.

(c) Applicant was discharged from his job as Results Clerk for reasons other than his physical limitations.

(d) Applicant performed the duties of said position while he was so employed in an efficient manner and without any limitation by reason of his general disability.

### ORDER

"IT IS ORDERED that applicant's Petition and Application for Readjustment or Reopening of Claim filed herein on September 25, 1967, be, and the same is hereby denied; and that applicant take nothing by virtue of said Petition.

"IT IS FURTHER ORDERED that the Findings and Award Denying Reopening of Claim dated October 16, 1967, be, and the same is hereby affirmed."

 There is no evidence that employment similar to the post-injury employment is available to the petitioner in the area of his residence. There is no evidence that employment of any substance is available to the petitioner in the area of his residence. The evidence as to the petitioner's efforts to seek employment was similar to the evidence which was presented at an earlier date and resulted in Finding No. 2(b) quoted above in relation to the May 1966 award. In our opinion, where the testimony discloses a satisfactory effort on the part of an injured workman to secure employment in the area of his residence, the burden of going forward with the evidence to show the fact of available suitable employment shifts to the party resisting the petition. There was no such showing made by the respondents. In our opinion, it is unrealistic to hold that an injured workman, who has the physical and mental capacity to hold a particular kind of job but whose emotional and nervous makeup is such that he cannot do the work in a continuous and satisfactory manner, should be charged with the earning capacity of such a job resulting in a diminution of his loss of earning capacity. Just as the employer must take his employee "as he is" prior to an industrial injury; so must the Commission evaluate the injured workman's actual capacity, physical, mental and emotional, in the light of the employment available in the area of his residence, an employment opportunity which it can be reasonably expected that the injured workman can perform. Under these circumstances:

The award is set aside.

DONOFRIO, P. J., and CAMERON, J., concur.