511 P.2d 187

**Bartholome H. DiAZ, Petitioner,**

**v.**

**The INDUSTRIAL COMMISSION of Arizona, Respondent,**

**Phelps Dodge Corporation, Respondent Employer,**

**State Compensation Fund, Respondent Carrier.**

**No. i CA–IC 787.**

Court of Appeals of Arizona, Division No. 1, Department A.

July 3, 1973.

Davis & Eppstein by Robert W. Eppstein, Tucson, for petitioner.

William C. Wahl, Jr., Chief Counsel, The Industrial Commission of Ariz., Phoenix, for respondent.

Robert K. Park, Chief Counsel, State Compensation Fund, and Evans, Kitchel & Jenckes, P. C., by Stephen W. Pogson, Phoenix, for respondent employer and respondent carrier.

STEVENS, Judge.

Bartholome H. Diaz, the petitioner herein, who had worked for the respondent employer in its smelter in the petitioner's native city of Douglas for 15 years as a furnace man and as a tapper, sustained an industrially related back injury on 14 March 1969. Surgery was required and performed. A 1971 consultation of three doctors rated his general physical functional impairment at 10%. His average monthly wage at the time of his injury was $826.40.

In the file certified to this Court we find a typewritten memorandum dated 15 July 1971 on which is an unsigned longhand endorsement to the effect that the petitioner could perform service station work for which he could reasonably earn $300 a month. On 27 July 1971 the Commission, apparently relying on the aforesaid longhand endorsement, entered its award finding a 10% general physical functional disability and fixing the loss of earning capacity at 63.7%. This award was timely protested by the petitioner. The protest was limited to the loss of earning capacity determination contained in the award. A hearing was held on 10 November 1971 which resulted in an award finding the same percentage of physical disability and increasing the percentage of loss of earning capacity to 66.72%. The sole issue before this Court is whether there was reasonable evidence presented which will sustain the percentage of loss of earning capacity found or whether the percentage figure should have been greater.

With the foregoing brief statement of the issues we further examine the background information.

Jacob B. Redekop, M.D., an orthopedic surgeon, examined the petitioner on 12 December 1969 and again on 1 April 1971 as a member of the three-doctor medical consultation group. The consultation report was rendered under the date of 6 April 1971. We quote the report in part as follows:

"It is felt that the patient's symptoms are out of proportion to his physical findings. It is felt that his back problem is stationary and that he is still sympto-

matic; he could be closed with a ten per cent general functional disability.

\* \* \*

"It is felt that the patient is able to do light work; it is felt that it would be difficult for him to return to his usual working status as a tapper. This decision is based upon the patient's *functional reaction* as well as the ten per cent permanent partial disability as a result of his disc and back surgery." (Emphasis Added).

The petitioner was examined by Frank A. Gruver, M.D., a psychiatrist, on 8 July 1970 and his report is dated 6 August 1970. The report indicated certain learning deficiencies. The petitioner had a limited grade school education. We quote a portion of the doctor's report as follows:

"There is no stigmata of psychotic illness present.

"My diagnostic impression would be that Mr. Diaz does have psycho-physiological overlay that is preventing him from recovering from his injury. The diagnostic category I would place this in would be psychophysiological disorder (musculo-skeletal). Because of his insistence on his desire to get back to work and because of the stress he places on the value of physical therapy, in my opinion, the treatment of choice would be a trial of a course of physical therapy, if at all possible, at the local hospital for sake of consistency and frequency of treatment.

"It is possible at this point he is ready emotionally to give up his symptoms. If he does not respond to a course of physical therapy, I would recommend that his case be considered stabilized therapeutically inasmuch as he lacks the motivation and the *sophistication* necessary to be a candidate for psychotherapy. I would think that the most therapeutic thing to do in the event of no response to physical therapy would be to close his case and settle on compensation to at least remove dependency on the State Compensation Fund." (Emphasis Added).

On 12 July 1971, in response to a speed letter from the Claims Department of the Commission, which sought information to assist the Commission in fixing the petitioner's loss of earning capacity, the petitioner responded advising of dizzy spells and that he did not drive a car anymore for the reason that it was too dangerous. In answer to a Commission questionnaire which accompanied the speed letter, the petitioner stated that he had no driver's license, that he had dizzy spells and that he had no grip in his left hand. He further advised that he was denied light duty employment by his employer and that when prospective employers learned of his medical background, they would not hire him. In response to another speed letter, he advised that it was hard for him to bend over, that his "dizzy spells are bad", that it is too dangerous for him to drive a car and his listed other complaints.

The 27 July 1971 award, heretofore referred to, which fixed his loss of earning capacity at 63.7%, was then entered. We quote, in part, the findings contained in that award.

"That applicant may reasonably be expected to return to work as a service station attendant and earn a monthly wage of $300.00."

Between the time of Dr. Gruver's examination and the 10 November 1971 hearing, the petitioner followed the doctor's recommendation that he submit to a course of physical therapy. Eight weeks of physical therapy produced no improvement in the petitioner's accident related psycho-physiological overlay.

At the 10 November 1971 hearing, while the petitioner was testifying, it was necessary to take a brief recess by reason of his statements "I'm getting dizzy \* \* \* I've got to take a glass of water."

At the hearing Dr. Redekop testified that the petitioner's weight lifting limitations were from 30 to 40 pounds. He stated that the petitioner's light work employment "should not require long standing and stooping."

Counsel for the petitioner interrogated the doctor as to the petitioner's physical capacity to work as a service station attendant and brought out that there are phases of service station work which the petitioner could not perform. The doctor agreed that if there be physiological problems the disability resulting therefrom would be in addition to the 10% disability attributed to the petitioner's back. The objective findings of the doctor in his 12 December 1969 examination and of the consultants in their 1 April 1971 examination are fully reflected by the 10% general physical functional impairment. Dr. Redekop felt that the petitioner's complaints were on a subconscious level.

At the hearing Dr. Gruver's report was received into evidence and he also testified. We quote portions of the doctor's testimony.

"Q. In the last paragraph of your letter, Doctor, on page 2, you indicate that it is possible at this point he is ready emotionally to give up his symptoms.

Would it be possible for you to elaborate on that, just exactly what it was that you meant? Or what it was that prompted you to make that statement?

"A. Well, the thing that prompted me to make the statement was towards the end of the interview Mr. Diaz had stated a desire for physical therapy, that he felt that this would be beneficial, that he had not received an extensive program of physical therapy. And he thought that this might get him back on his feet and allow him to go back to work.

My diagnostic impression being what it was, it is sometimes possible when whatever emotionally the symptoms are compensating for, sometimes it's possible that this no longer exists, yet the symptoms stay on.

If emotionally a patient is ready to give up the symptoms, then they sometimes do respond to a very stylized and structured therapeutic program.

When properly presented in terms of 'this is the way that we'll get you over these symptoms.'

"Q. Now, the symptoms you're speaking of were those that gave rise to you diagnostic impression of psycho-physiological overlay?

"A. Well, not the symptoms per se. The symptoms that he was complaining of was low back pain, difficulty with his legs, I believe—yes. Weakness of the left leg, pain in the heel, low back pain.

He was also complaining of other symptoms which I would categorize as hysterical in nature; ringing of the ears, flashes of pressure in back of his skull. He was also complaining of headaches at the time I saw him.

"Q. Could you relate those symptoms, Doctor, to any particular event?

"A. I would relate them to his neurosis, which I would have to relate to an event, his injury.

\*    \*    \*    \*    \*    \*

"Q. Would it be possible then, given as a fact that he did go through this eight week period of physical therapy that he could have overcome his psycho-physiological overlay? Or the effects of it?

"A. If he went through a period of physical therapy and the symptoms were not improved, I would think that this would indicate that his symptoms were still serving an emotional question that had not been answered."

Apparently the key witness on the loss of earning capacity issue was Virginia Middleton, a rehabilitation counselor employed by the State Compensation Fund. Her testimony was based upon a review of the file and her knowledge of the Douglas labor market through contacts with the Arizona State Employment Service, as well as "through contacts with claimants themselves." There was no showing of a personal contact with the petitioner. She testified that she did not attempt to start a rehabilitation program for the petitioner in

August 1970 because of her desire to have clarified the matter of the petitioner's dizziness problems. She recommended to the State Compensation Fund that there be additional physical examinations of the petitioner to assist in an evaluation of the petitioner's rehabilitation potential and that request was refused.

Virginia Middleton's testimony did not urge the service station employment specified in the July 1971 award but urged that the petitioner was qualified for light delivery truck employment which she stated was available from time to time in the Douglas area in connection with such businesses as Penney's, Sears and Firestone. She assumed that the delivery service would include the delivery of all items sold by these businesses and that the employee would be required to load and unload the truck without additional assistance. She admitted that there were other disabled people in the Douglas area who might fill such a job.

Dr. Redekop's limitations on the maximum weight lifting and on stooping were not explored in relation to the type of physical requirements related to light delivery truck employment. There was no evidence that the prospective employers would accept the petitioner as an employee with his physical limitations and with his dizziness. We do not know how many other disabled persons might desire these jobs and whether their qualifications might be more attractive to prospective employers.

We quote two paragraphs from the findings of the hearing officer which were approved by the Commission:

"F. That as a result of the accident of March 14, 1969 the applicant sustained an injury to his low back, requiring surgery and is limited in that he should not engage in work involving lifting over 30 to 40 pounds and to engage in work requiring long standing and stooping. He is unable to return to work as a furnace man and 'tapper.'

"G. That with his industrial disability the applicant has the physical and mental capabilities of working as a light delivery truck driver and can reasonably be expected to earn a sum, which when related to the wage scale at the time of injury amounts to the sum of $275.00 per month and that such work is available in the community where the applicant lives."

We quote extensively from Loyd Davis v. Industrial Commission of Arizona, 82 Ariz. 173, 309 P.2d 793 (1957):

"The problem of determining the future earning capacity of a disabled man involves a certain amount of indefiniteness. The object is to determine as near as possible whether in a competitive labor market the subject in his injured condition can probably sell his services and for how much. To support a finding in this respect the commission must have evidence that will at least demonstrate the reasonableness of the determination made. There must be something that will justify the conclusion that he is able to perform the services which are used as a basis for measuring earning capacity. In the light of the medical evidence alone, we are unable to detect any rational basis for determining that petitioner can secure or can successfully perform the kind of work that the commission has used as a basis for deciding that he is in the future capable of earning $190 per month. All the medical evidence indicates otherwise. The only clue with any indication of his ability to perform these services is a statement petitioner made at the initial hearing before he knew of the failure of the operation that if he could secure such employment, he was willing to try and might be able to do it. This is entirely inadequate to freeze a man with his ailment to a future earning power for this class of work when the doctors concede he cannot even do moderately light work. The only kind of gainful occupation he was ever able to follow was that of common laborer and ranch worker. We do not mean to say the undisputed evidence necessarily compels a total permanent dis-

ability rating but in determining a partial disability, there must be some evidence that the man is able to adequately perform the services in the classification prescribed." 82 Ariz. at 175, 309 P.2d at 795.

Timmons v. Industrial Commission of Arizona, 83 Ariz. 74, 316 P.2d 935 (1957), quotes the Loyd Davis case with approval.

In Meadows v. The Industrial Commission of Arizona, 12 Ariz.App. 114, 467 P.2d 954 (1970), this Court was faced with a loss of earning capacity situation wherein the injured employee did have the mental and physical ability to perform the job but lacked the emotional stability which was necessary for successful performance.

In Dorothy I. Davis v. Industrial Commission of Arizona, 16 Ariz.App. 535, 494 P.2d 735 (1972), we reaffirmed another phase of the holding in Meadows, supra, as follows:

" 'In our opinion, where the testimony discloses a satisfactory effort on the part of an injured workman to secure employment in the area of his residence, the burden of going forward with the evidence to show the fact of available suitable employment shifts to the party resisting the petition.' " 16 Ariz.App. at 538, 494 P.2d at 738.

The petitioner urges that the present method of determining loss of the earning capacity is not fair to the injured workman. In Broadus v. Industrial Commission of Arizona, 18 Ariz.App. 429, 503 P.2d 387 (1972), we recognized that the statutes cast the duty of the determination upon the Commission independent of the determination of the physical functional disability resulting from the industrial accident. There appear to be no guidelines. The initial determination in the matter now before us is an ex parte declaration entered with no apparent factual basis, merely an unsigned opinion by someone. When the petitioner presented evidence at the hearing that he was unable to secure or perform service station employment, the open labor market job initially selected by the Commission, he was faced with the contention that the suitable available open labor market employment would be light delivery truck employment, again with no real factual basis introduced to sustain this selection. The respondents urge that the employment areas to be presented at the loss of earning capacity hearing are subject to discovery under Rules 44 and 46 of the Rules of Procedure before The Industrial Commission of Arizona, effective 1 September 1970, which rules were in effect at the time of the hearing. We express no opinion as to the adequacy of these discovery procedures to enable the injured workman to be fully informed as to the evidence which will be presented at the loss of earning capacity hearing. In view of our holding in this case we need not declare ourselves in relation to the problem urged by the respondents.

The above-quoted paragraph (F) of the hearing officer's findings are sustained by the evidence. We note, however, that the hearing officer's findings are silent as to the undisputed evidence relative to the presence of a psycho-physiological overlay and are silent as to the effect thereof upon the petitioner's capacity to compete in the open labor market. It is hard for us to visualize a light delivery service for the businesses mentioned in Virginia Middleton's testimony which would entail no stooping to load and unload a truck and which would have no items which weighed in excess of the 30 to 40 pound limitation. In our opinion the established facts do not support the crucial findings which are set forth in the above-quoted paragraph (G).

The petitioner has established his good faith efforts to secure employment. The respondents have not gone forward with sufficient evidence "to show the fact of available suitable employment" as required by the Meadows and Dorothy I. Davis opinions.

The award is set aside.

DONOFRIO, P. J., and OGG, J., concur.